# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CT-01826-SCT

*BLAINE BROOKS*

*v.*

*STATE OF MISSISSIPPI*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 10/10/2001 |
| TRIAL JUDGE: | HON. MIKE SMITH |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | RICHARD M. GOLDWASSER |
| | PAUL McGERALD LUCKETT |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  W. GLENN WATTS |
| DISTRICT ATTORNEY: | DUNN LAMPTON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 03/24/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE FOR THE COURT:**

¶1.    The following testimony was provided by Detective Robert Holmes in the murder

prosecution of Blaine Brooks:

> I felt I had just a limited amount of time, before he was appointed an attorney, to try to
> conduct a lineup.  And that's what I did. . . . Because . . . you're going to be appointed
> an attorney sooner or later.

> [H]e informed me . . . he did not have an attorney.  So at that point in time, I used my
> advantage.  I conducted a physical lineup . . . before he was appointed an attorney. . . .

I asked him if he'd like to speak with me? And he said, no, he did not. He wanted to wait until he [sic] have an attorney for him.

¶2. This testimony, together with other errors discussed below, requires us to reverse this murder conviction (which the Court of Appeals has previously affirmed) and to remand this case for a new trial.

## BACKGROUND FACTS AND PROCEEDINGS

¶3. We borrow from the Court of Appeals' opinion the following recitation of facts:

On May 17, 1999, Merry Wilson was found dead in her home. Wilson died as a result of multiple stab wounds inflicted by a two-pronged fork which was recovered from her throat. The pathologist testified that Wilson had probably died sometime between the twelfth and the fifteenth of May. Wilson had also recently inherited $10,000 and her bed and mattress had been ransacked.

A neighbor, Sandra Graham, stated that she had seen an African American male leaving the victim's home in the early morning of May 13. During a photographic line-up, Graham identified Brooks as the man leaving Wilson's home that morning. Prior to this, Brooks's mother, Towanda Nobles, had told her half-sister, Sherry Maxine Hodges Smith, that Brooks told her that he had stabbed Wilson. After Smith reported this statement to the police, neither Brooks nor Nobles could be located. Brooks had taken a bus to Chicago on May 14th. Brooks was arrested in Chicago in July 2000 and extradited to Mississippi in February 2001. There was a line-up at the jail, where Graham again identified Brooks as the man she had seen leaving Wilson's home the morning of May 13th.

*Brooks v. State*, 2004 WL 1516503 (¶¶ 2-3) (Miss. Ct. App. 2004).

¶4. Because Brooks did not have counsel when he participated in the lineup, his trial counsel moved to suppress the identification, and the testimony recited above was provided at the hearing on that motion. After the trial court denied Brooks's motion to suppress the identification at the lineup, Brooks was convicted of murder and sentenced to serve life in prison. On appeal to this Court, Brooks raises the following issues:

I. Whether a defendant, who has invoked his right to counsel, later waives his Sixth Amendment right to have counsel present at his lineup when he subsequently participates in a lineup purposefully held before the defendant is appointed counsel.

II. Whether a defendant who has been denied his right to counsel at a lineup has the burden of demonstrating that the lineup was impermissibly suggestive in order to exclude evidence of the lineup identification at trial.

III. Whether an utterance made two to three days after a startling event is properly admitted into evidence under the excited utterance exception to rule against hearsay.

IV. Whether Rap Lyrics extolling murder were properly read to the jury where there was not foundation laid for their introduction into evidence.

Because issues I and II are closely related, we will discuss them together.

**DISCUSSION**

**I. Whether a defendant, who has invoked his right to counsel, later waives his Sixth Amendment right to have counsel present at his lineup when he subsequently participates in a lineup purposefully held before the defendant is appointed counsel.**

**II. Whether a defendant who has been denied his right to counsel at a lineup has the burden of demonstrating that the lineup was impermissibly suggestive in order to exclude evidence of the lineup identification at trial.**

¶5. Although not precisely stated in the issues, the crux of Brooks's argument to this Court concerning the lineup identification is that Graham's in-court identification was tainted because she had previously identified him at a physical lineup without the presence of counsel after adversarial proceedings against him had begun. We therefore will review both the in-court and lineup identifications.

3

¶6.    A participant in a lineup has a constitutional right to have a lawyer present if the lineup is held after adversarial proceedings had been initiated against him. *Jimpson v. State*, 532 So.2d 985, 988 (Miss. 1988); *York v. State*, 413 So.2d 1372, 1383 (Miss. 1982).

¶7.    In *Coleman v. State*, 592 So.2d 517 (Miss. 1991), this Court held:

> As a matter of the law of this state, the right to counsel attaches once the accused is in custody (a fact generating the legal conclusion that the individual is under arrest) and all reasonable security measures (of evidence and persons) have been completed. At all critical stages thereafter, the accused is of right entitled to access to counsel, absent a specific knowing and intelligent waiver tied to that stage.

*Id.* at 520.

¶8.    Adversarial proceedings had certainly commenced against Brooks prior to the lineup. An arrest warrant had been issued, and he had been extradited from Illinois.    Furthermore, Brooks had signed a document indicating that he did not want to speak to any law enforcement authorities either in Illinois or Mississippi for any investigation.

¶9.    In *United States v. Wade*, 388 U.S. 218, 236-37, 87 S. Ct. 1926, 18 L.Ed. 2d 1149 (1967), the United States Supreme Court held:

> Since it appears that there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial, and since presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial, there can be little doubt that for Wade the post-indictment lineup was a critical stage of the prosecution at which he was as much entitled to such aid (of counsel) as at the trial itself.   Thus both Wade and his counsel should have been notified of the impending lineup, and counsel's presence should have been a requisite to conduct of the lineup, absent an intelligent waiver.

*Id.* (citations & quotations omitted).

¶10.    It is undisputed that adversarial proceedings had begun against Brooks at the time of the physical lineup.  He had not been arraigned; and he was not represented by counsel.  Accepting as true Detective Holmes's testimony, he informed Brooks that he did not have to participate in the lineup (although Brooks took the stand and denied the assertion), but he also testified that Brooks did not respond and participated in the lineup.  The Court of Appeals found this lack of response to be an intelligent waiver.  We disagree.  This Court will "indulge every reasonable presumption against the waiver of a constitutional right." *Vickery v. State*, 535 So.2d 1371, 1377 (Miss. 1988) (quoting *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393, 57 S.Ct. 809, 81 L.Ed. 1177 (1937)).  Furthermore, silence can never be an intelligent waiver where a defendant has invoked the constitutional right to have an attorney present.  This Court has held: "Just as written waivers are insufficient to justify police-initiated interrogations after the request for counsel in a Fifth Amendment analysis, so too they are insufficient to justify police-initiated interrogations after the request for counsel in a Sixth Amendment analysis." *Balfour v. State*, 598 So.2d 731, 742 (Miss. 1992).  If a written waiver is insufficient, then even more so is silence.

¶11.    We find that the physical lineup was conducted in violation of Brooks's constitutional right to counsel.  Graham and Detective Holmes should not have been permitted to testify that Graham identified Brooks at the physical lineup.  In *Gilbert v. California*, 388 U.S. 263, 87 S. Ct. 1951, 18 L.Ed. 2d 1178 (1967), the United States Supreme Court held:

> The State is therefore not entitled to an opportunity to show that that testimony had an independent source. **Only a per se exclusionary rule as to such testimony can be an effective sanction to assure that law enforcement authorities will respect the accused's constitutional right to the presence of his counsel at the critical lineup**. In the absence of legislative regulations

5

adequate to avoid the hazards to a fair trial which inhere in lineups as presently conducted, the desirability of deterring the constitutionally objectionable practice must prevail over the undesirability of excluding relevant evidence.

*Id.* at 272-73 (emphasis added).

¶12.    Trial error does not always require reversal. In ***Nicholson v. State***, 523 So.2d 68, 74

(Miss. 1988), this Court held that:

> The record in this case is unclear as to whether or not Nicholson was even under arrest at the time of the voice lineup. However, even if the voice lineup was conducted in violation of Nicholson's right to counsel, use of the voice lineup identification testimony at trial was harmless constitutional error. In so holding, we note that the voice lineup was not the first confrontation of the victim and defendant. Ms. McKinion had previously identified Nicholson as her assailant in a photo identification and an inadvertent voice showup, both of which she was able to make because of the substantial amount of time she spent in intimate contact with her assailant. Had this voice lineup been the first confrontation, and in violation of Nicholson's right to counsel, under the rationale of Moore and Gilbert, testimony of any subsequent pre-trial identifications would also have been inadmissible because of the possibility of exploitation of the initial illegality. See *Moore* [*v. Illinois*, 434 U.S. 220, 231 (1977);] *Gilbert*, 388 U.S. at 273, 87 S.Ct. at 1957. *In a related matter, we note that even if the voice lineup had been conducted in violation of Nicholson's right to counsel, the in-court identification would still be permitted "upon a showing by clear and convincing evidence that the in-court identifications are based on observations of the suspect other than a lineup identification." York* at 1383, citing *U.S. v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (emphasis added).

523 So. 2d at 74.

¶13.    Having found the lineup identification was conducted in violation of Brooks's constitutional rights, we must now determine whether the in-court identification was based on observations of Brooks other than the lineup identification.

¶14.    The record amply supports the State's argument that Graham's in-court identification was based on observations of Brooks other than the lineup. She had identified him first at a

6

photo lineup.[1]  More importantly, Graham clearly testified more than once that her in-court identification of Brooks was based on her observation of him leaving the victim's home on the morning of the crime.  She testified that she had no doubt in her mind that Brooks was the person she observed.  She testified that she walked by the victim's house every day, and she noticed unusual activity.  She testified she looked directly at his face and Brooks looked back at her.  She saw him putting a cigarette in his mouth.  She also testified that she saw "the protrusions of his lips and the eyes and the hair."

¶15.  *Neil v. Biggers*, 409 U.S. 188, 198, 93 S. Ct. 375, 34 L.Ed. 2d 401 (1972), provides five factors to be considered in evaluating the likelihood of misidentification.  The factors include (1) opportunity of witness to view the criminal at time of crime; (2) witness's degree of attention, (3) accuracy of witness's prior description of the criminal, (4) level of certainty demonstrated by witness at the confrontation, and (5) length of time between the crime and the confrontation. Thus, under the holding in *York* and *Biggers*, we find that Graham's independent recollection of Brooks from the crime scene, followed by her identification from the photo line-up, provide marginal insulation from the constitutionally impermissible identification at the physical lineup, and the in-court identification was not error.  We further hold that *standing alone*, the error committed by the trial court in allowing testimony about the unconstitutional identification at the physical lineup would be harmless.  However, when combined with the other error committed in this case, it further justifies reversal.

---

[1]The photo identification was not made an issue before this Court.

7

**III.** **Whether an utterance made two to three days after a startling event is properly admitted into evidence under the excited utterance exception to rule against hearsay.**

¶16. The State served notice on the defense that it intended to use at trial a hearsay statement attributed to Brooks. The State planned to call Sherry Maxine Smith Hodges, who would testify that she was told by Brooks's mother, Towanda Nobles, that Brooks had admitted committing the crime. Since this amounted to double hearsay, Brooks filed an objection which resulted in a hearing.

¶17. At the hearing, Detective Robert Holmes was called as a witness by Brooks's counsel. He testified that he had interviewed Sherry Hodges, who gave details of the crime, and "she would not have had knowledge of it not unless someone who specifically knew the details of it could have told her." He further testified that Sherry Hodges lied to him when she stated she first heard of the murder on the police scanner. When Detective Holmes confronted her with the fact that the news had not been on the police scanner, Sherry Hodges changed her story and stated that she learned from Brooks's mother, Mrs. Nobles. Sherry Hodges told the detective that Mrs. Nobles had come to her home in a very emotional state of mind, and she told Hodges that her son, Brooks, had confessed to the murder. Sherry Hodges told Detective Holmes that she lied at first because "she knew she was going to have to end up testifying against her relatives."

¶18. Detective Holmes testified that he also interviewed Brooks's mother, Towanda Nobles, on May 17, 1999, who stated that she had learned of the murder from a friend named Pam Smith. She further told Detective Holmes that she had not told Sherry Hodges that Brooks had confessed the crime to her, that is, that Sherry Hodges's statement "wasn't true."

¶19. The trial judge ruled that Sherry Hodges would be allowed to testify about the statements made by Brooks's mother, including the confession. In the trial court's opinion, the statements were admissible under both the excited utterance exception to the rule against hearsay, and the "catch-all" provision of M.R.E. 803(24).

¶20. At trial, Sherry Hodges provided the expected testimony, that is, three days following the murder she was told by Brooks's mother, who had been told by Brooks, that he (Brooks) committed the crime.

¶21. Double hearsay "is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule . . . ." M.R.E. 805. The State claims that Brooks's confession to his mother amounted to a statement made against Brooks's self interest, which is an exception under M.R.E. 804(b)(3). The State further contends that, because Nobles was crying and visibly upset as testified to by Smith, Nobles's statement to Smith was an excited utterance and therefore admissible. We do not agree. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." M.R.E. 803(2). The murder occurred on May 13, 1999. When Brooks confessed to his mother at her place of employment, he was wearing bloody clothes. This provides the only evidence of the date of the confession which we must accept as May 13, the day of the murder. It wasn't until three days later that Nobles confided in her half-sister. Although the excited utterance exception "sets no specific time limit, nevertheless, under our precedent case law, this Court has not allowed the admission of an excited utterance exception when the time frame was more than

9

twenty-four hours." ***Smith v. State***, 733 So.2d 793, 798 (Miss. 1999). The reason for this is found in the comments to M.R.E. 803(2).

> [T]he underlying theory of the excited utterance exception is that circumstances may create such an excited condition that the capacity for reflection is temporarily impeded and that statements uttered in that condition are thus free of conscious fabrication. The essential ingredient is spontaneity. With respect to time element, the issue is the duration of the excited state. This depending on the exact circumstances of a case, vary greatly. The declarant need not be a participant but only an observer of the event which triggered the excitement. An excited utterance need only "relate" to the startling event, and therefore, the scope of the subject matter of the statement may be fairly broad.

M.R.E. 803 cmt.

¶22. The Court of Appeals' majority held that, since there was evidence of Nobles's hysteria, the trial court judge did not abuse his discretion. We disagree. There is little doubt that most mothers would be stressed, even hysterical, upon hearing their child confess to committing murder. However, because "this Court has not allowed the admission of an excited utterance exception when the time frame was more than twenty-four hours," ***Smith***, 733 So. 2d at 798, citing ***Heflin v. State***, 643 So. 2d 512, 519 (Miss. 1994), the trial court abused its discretion in finding the testimony qualified as an excited utterance.

¶23. The separate concurring opinions by King, C.J., and Southwick, P.J., disagreed with the Court of Appeals' conclusion that Nobles's statement to Smith was an excited utterance. Instead, they would have held that the trial judge was correct in finding that the statement was "also admissible under 803(24)." This exception provides:

> A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

M.R.E. 803(24).

¶24. Because this case is being reversed on other grounds, the trial court will be required to review this issue again. We find on the record before us that the testimony did not meet the requirements of Rule 803(24). The trial court conducted a pretrial hearing, but only Detective Holmes testified. The trial court should have also heard the testimony, including cross-examination, from Sherry Hodges out of the presence of the jury. This would have afforded the trial court an opportunity to witness her demeanor and judge her credibility (for purposes of the hearsay exception) prior to making a determination of reliability. This is a very close issue in this case. There are indications of reliability and reasons for concern.

¶25. Weighing against reliability, we have the fact that Sherry Hodges initially lied to the police. We also are told that Hodges knew details of the murder not known to the general public. Finally, this was double hearsay, which means that the court had no opportunity to observe Brooks's mother for purposes of reliability. This is particularly important since Brooks's mother denied to the police that Brooks confessed to her or that she said as much to Sherry Hodges.

¶26. Weighing in favor of reliability, we have a mother in a very emotional state, providing details which implicate her son in a murder. There is also confirmation that Brooks's mother was where Sherry Hodges said she was when Brooks allegedly told her of the murder. Also, the explanation provided by Sherry Hodges of her initial lie, is reasonable.

¶27. With all of these factors to be weighed in determining whether the double hearsay is of sufficient reliability to be admissible, we hold that the trial court must hear a proffer of Sherry Hodges's direct testimony and cross-examination, prior to ruling on whether the hearsay is admissible under Rule 803(24).

¶28. We therefore hold that the trial court abused its discretion in ruling the testimony admissible under the excited utterance exception, and we further hold that the trial court abused its discretion by failure to hear the testimony of Sherry Hodges prior to ruling on whether the hearsay meets the exception provided under Rule 803(24). This may be done on retrial.

### IV. Whether Rap Lyrics extolling murder were properly read to the jury where there was not foundation laid for their introduction into evidence.

¶29. Brooks asserts that the trial court erred in allowing the detective to read "rap" lyrics to the jury without any prior foundation. This issue is bound up with a similar issue, and we will address the two together.

¶30. The trial court allowed the State to introduce into evidence some rap lyrics presumably written by Brooks which extolled murder. Additionally, the trial court allowed the State to inform the jury that Brooks had been involved in gang activity and that he had a tattoo of the Grim Reaper holding a pitchfork. The jury learned that Brooks's gang uses the symbol of a six-pointed star and a pitchfork as its signs. Brooks says this evidence of his character should not have been allowed into evidence. M.R.E. 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however be admissible for other purposes such as proof of . . . identity. . . .

12

¶31.    The State tells us this evidence was not offered to show Brooks's bad character, but rather for the purpose of identity because the victim was stabbed repeatedly in the neck with a meat fork.   In other words, the gang follows the devil; the devil uses a pitchfork; the victim was stabbed with a meat fork.

¶32.    When determining whether to admit evidence under Rule 404(b), we utilize a two- part analysis. "The evidence offered must (1) be relevant to prove a material issue other than the defendant's character; and (2) the probative value of the evidence must outweigh the prejudicial effect." *Crawford v. State*, 754 So.2d 1211, 1220 (Miss. 2000) (citation omitted).   In *Hoops v. State*, 681 So.2d 521 (Miss. 1996), this Court held:

> To be sure, evidence admissible under Rule 404(b) is also subject to the prejudice test of Rule 403; that is, even though the Circuit Court considered the evidence at issue admissible under Rule 404(b), it was still required by Rule 403 to consider whether its probative value on the issues of motive, opportunity and intent was substantially outweighed by the danger of unfair prejudice. In this sense Rule 403 is an ultimate filter through which all otherwise admissible evidence must pass.

651 So. 2d at 530-31.  In *Hoops*, although the trial judge did not use the "magic words," this Court found that he "implicitly made the determination." *Id*. at 531.

¶33.    Citing *Hoops*, the Court of Appeals deemed the following statement from the trial judge to imply that he had made the determination under M.R.E. 403: "I'm going to let it in, yes.   I'm going to let them, this fork, and let the jury decide whether this fork represents a - - if that's the testimony, then I'm going to let the jury decide whether or not the fork represents a pitchfork." *Brooks*, 2004 WL 1516503 at (¶ 24).

¶34.    The lyrics presumably written by the defendant make no mention of gangs.   The lyrics discuss murder by use of a gun, not a fork.

13

¶35. We hold that the trial court made no attempt on the record to determine whether the probative value of the evidence outweighed the prejudicial harm. Furthermore, we find that, based upon the record before us, the tattoo and gang-related evidence would not have survived a Rule 403 analysis had it been conducted.

## CONCLUSION

¶36. Because of the violation of Brooks's constitutional right to counsel at the lineup, combined with the impermissible hearsay testimony and the improper admission of gang-related evidence without proper foundation or M.R.E. 403 analysis, we reverse the judgments of the Court of Appeals and the Pike County Circuit Court and remand this case to the circuit court for a new trial consistent with this opinion.

¶37. **REVERSED AND REMANDED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON AND GRAVES, JJ., CONCUR. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ AND RANDOLPH, JJ., NOT PARTICIPATING.**