977 So.2d 344 (2007)
Devail HUDSON, Appellant
v.
STATE of Mississippi, Appellee.
No. 2005-KA-01298-COA.
Court of Appeals of Mississippi.
April 10, 2007.
Rehearing Denied November 20, 2007.
Pearson Liddell, Mississippi State, attorney for appellant.
Office of the Attorney General by Jacob Ray, attorney for appellee.
EN BANC.
CARLTON, J., for the Court.
¶ 1. Devail Hudson was convicted by an Oktibbeha County Circuit Court jury for the crime of capital murder. On appeal, he challenges the admissibility of certain evidence. Finding no error, we affirm his conviction and sentence.

FACTS
¶ 2. On the morning of August 20, 2001, Dalton Lee Miller and Juanita Miller, who had been married approximately fifty years, shared breakfast in their home at 226 Reed Road, Starkville, Mississippi. Mr. Miller left his house around 7:40 a.m. to attend to business matters. When he returned home several hours later, his yard was filled with police officers and firefighters as smoke poured from his house. Mr. Miller's son, Andy, directed him to the area of his front yard where paramedics were working on Mrs. Miller, *345 who had been severely beaten. Mrs. Miller, who was seventy-seven years old, died that afternoon at the Baptist Memorial Hospital in Columbus.
¶ 3. On January 25, 2002, Hudson was indicted by an Oktibbeha County grand jury for capital murder. Specifically, the indictment alleged that Hudson murdered Juanita Miller while engaged in the commission of the crime of robbery, pursuant to Mississippi Code Annotated section 97-3-19. A jury trial was held on September 13-18, 2004.
¶ 4. Dr. Stephen Hayne, the pathologist who performed a forensic postmortem examination of Mrs. Miller, testified as an expert in the field of forensic pathology. Dr. Hayne testified that Mrs. Miller suffered blunt force trauma to her head, shoulder, back, and left leg. He further testified that Mrs. Miller had been struck twelve to fifteen times with moderate to severe force. According to Dr. Hayne, Mrs. Miller's injuries were consistent with being struck with a clothing iron that was recovered at the Millers' home. The external examination also revealed bruises and scratches on the palm, fingers, and back of Mrs. Miller's right hand and left arm. Dr. Hayne explained that such injuries are known as defensive posturing injuries, and that they are caused by the attempt of a conscious individual to ward off blows to the face, neck, and chest. Dr. Hayne concluded that lethal brain swelling was the ultimate cause of Mrs. Miller's death.
¶ 5. Roger Mann, the fire marshal who investigated the Millers' home, also testified. According to Mann, there were at least five separate locations where fires began inside the Millers' home. Mann testified that, given the multiple origins of the fires, one fire could not have induced another. He further testified that there was no apparent electrical or mechanical failure which could have caused the fires. Consequently, Mann concluded that the fires were caused by arson.
¶ 6. Jamie Bush, a forensic scientist with the Mississippi Crime Lab, testified as to the scene of Mrs. Miller's brutal attack-the sewing room inside the Millers' home. Considerable amounts of blood were discovered in the room, including on a chair covered with blood splatter, on a pair of eyeglasses on the floor next to a clump of hair, and on a clothing iron smeared with blood. No fingerprints were salvageable from the clothing iron.
¶ 7. Bush also testified that the master bedroom of the house had suffered intensive fire and smoke damage. Filing cabinets in the master bedroom had been rummaged through and most of the drawers in the room had been pulled out and dumped on the floor. Bush testified that they found money on the floor, including a $100 bill lying out in the open, and an envelope containing a $100 bill and four $50 bills. No fingerprints were recovered from the money or from the envelopes.
¶ 8. The jury also heard testimony regarding the work of two tracking dogs that were used in the investigation. On August 20, 2001, the first tracking dog, a Labrador retriever, conducted a free-scent search, as no particular suspect's sample scent was available. The retriever picked up a scent from the back door of the Millers' home and followed it to the home of Hudson's mother. The second tracking dog, a bloodhound, conducted two searches on August 23, 2001. The first search began at Lander's Trailer Park, where Hudson's girlfriend, Juanita Quinn, lived. The bloodhound was given Hudson's scent and released on a long lead. The dog followed the scent to the back door of the Millers' home. The second search began in another part of the trailer park, but ended in *346 the same location, the back door of the Millers' home.
¶ 9. Investigator Bill Lott of the Starkville Police Department testified that he made a list of suspects which consisted of people living in the vicinity of the Millers' home who had committed serious crimes. All of the suspects on the list were promptly accounted for, with the exception of Hudson, who had an outstanding warrant for his arrest. Consequently, on the afternoon of August 20, 2001, Hudson was arrested for unrelated charges. Inspector Lott testified that the case came to a standstill after an unfruitful search of the home of Juanita Quinn, Hudson's girlfriend. According to Inspector Lott, the break in the case came when someone called the police station to speak with detectives about the Miller case. Bentore Riley voluntarily came forward and gave a statement to the police.
¶ 10. Riley testified that on August 20, 2001, at about 9:00 a.m., he saw Hudson standing on the corner of Northside and West Drive with a group of men, including Willie Prater, Derrick Turner, Lemarc Evans, James Pastor, and Destiny Moore. Riley approached the men because one of them, Destiny Moore, was wearing Riley's tennis shoes. Riley testified that he confronted Moore about the shoes, and that Moore gave back his shoes and retrieved another pair from a nearby house. After Moore returned, Hudson said to the group, "come on, let's go." According to Riley, Hudson told the group that they were "fixing to go to that old woman's house" and to "see what she had inside it." Riley testified that when Prater asked what would happen if the woman found them in her house, Hudson said, "we are going to kill her."
¶ 11. Regarding his involvement, Riley testified that he agreed to be the look-out because he was afraid because the men were in a gang. He further testified that he thought that they would kill him or his family. Even though Riley had earlier testified that Moore returned his shoes before they went to the Millers' house, Riley also testified that he felt compelled to go with the group and to be the watch-out "since one of them had [his] shoes." According to Riley, when the men entered the Millers' house through the back door, he attempted to call the police. The next thing Riley saw was Turner running from the house. Riley testified that Hudson and Prater were the last two men to come out of the house, and that Hudson went to the trailer park directly after leaving the Millers' house.
¶ 12. On September 18, 2004, the jury convicted Hudson of capital murder. Hudson was sentenced to serve a term of life imprisonment without parole in the custody of the Mississippi Department of Corrections. His appeal has been assigned to this Court.

DISCUSSION
1. Prejudicial Evidence
¶ 13. Hudson relies on case law in arguing that the trial court erroneously admitted evidence that indicated Hudson was in a gang. Brooks v. State, 903 So.2d 691 (Miss.2005); Pleasant v. State, 701 So.2d 799 (Miss.1997); Hoops v. State, 681 So.2d 521 (Miss.1996); Goree v. State, 748 So.2d 829 (Miss.Ct.App.1999). He argues that there was no proper foundation for this evidence, and that the trial court did not balance the probative value and prejudicial effect of this evidence pursuant to Mississippi Rule of Evidence 403.
¶ 14. During direct examination, the State asked Riley why he was afraid of the group of men. Hudson promptly objected, and a bench conference was held. Hudson argued that the testimony that Riley was *347 about to give  that the group of men were in a gang  was inflammatory, irrelevant to the real issue of the case, and that any probative value of the testimony was out-weighed by its prejudicial effect. Hudson further argued that there was no way of refuting Riley's testimony, and that to tell the jury that Hudson was in a gang without any proof of gang affiliation would cause irreparable damage. The State cited Pleasant and argued that the gang testimony was relevant as to whether Riley was afraid of the group of men and why he was afraid. After the court overruled Hudson's objection, the following exchange took place:
[THE STATE]: Why were you afraid of them?
[RILEY]: Because they was in a gang.
[THE STATE]: And what were you afraid was going to happen if you didn't do what they said? Explain to the ladies and gentlemen of the jury.
[RILEY]: I thought they was going to kill me or kill my family.
¶ 15. Due to this questioning, the defense also raised the issue of gang affiliation while conducting a cross-examination of Riley. The following exchange took place between defense counsel and Riley during that cross-examination:
[DEFENSE COUNSEL]: Were you in a gang?
[RILEY]: No, sir.
[DEFENSE COUNSEL]: How do you know they were in a gang?
[RILEY]: Destiny Moore was saying they was.
[DEFENSE COUNSEL]: Oh, okay. So you conclude they were in a gang because one person said they were in a gang?
[RILEY]: Yes, sir.
[DEFENSE COUNSEL]: That's the only proof you got that they were in a gang; isn't that correct?
[RILEY]: Yes, sir.
¶ 16. Hudson argues that the trial court erred in overruling his objection to Riley's testimony that Hudson was in a gang. Hudson argues that the State's reason for introducing the gang testimony was insufficient for purposes of Rule 404. He argues that admissibility of gang affiliation requires that the evidence be related to the motive of the crime. Hudson further argues that the gang testimony was admitted without laying a proper foundation and that the court failed to conduct an explicit or implicit analysis under Rule 403.
¶ 17. An appellate court does not conduct a de novo review on the admissibility of evidence under Rule 403. Jones v. State, 904 So.2d 149, 152(¶ 7) (Miss. 2001). Trial courts have the discretion to determine whether potentially prejudicial evidence possesses sufficient probative value. Id. This determination on admissibility is highly discretionary because Rule 403 "does not mandate exclusion but rather provides that the evidence may be excluded." Id. Our review is confined to "simply determine whether the trial court abused its discretion in weighing the factors and in admitting or excluding the evidence." Id.; see also Jackson v. State, 784 So.2d 180, 183(¶ 9) (Miss.2001). A Rule 403 analysis "asks only that a judge rely on his/her own sound judgment." Jones v. State, 920 So.2d 465, 476-77(¶ 33) (Miss.2006) (citing Jenkins v. State, 507 So.2d 89, 93 (Miss. 1987)).
¶ 18. Rule 404(b) states in part that evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, *348 plan, knowledge, identity, or absence of mistake or accident." Rule 403 provides that evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We now turn to the cases upon which Hudson relies.
¶ 19. In Hoops, the supreme court considered the admissibility of evidence of a defendant's gang affiliation. The court concluded that evidence of gang affiliation can be admissible to show motive under Rule 404(b) if it also passes a Rule 403 balancing test. Hoops, 681 So.2d at 530. The court held that the trial judge, in Hoops, implicitly determined that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence, even though the trial judge failed to use "magic words." Id. at 531. This conclusion was reached because the trial judge heard argument from both parties on the matter prior to ruling that the evidence was admissible. Id.
¶ 20. In Pleasant, the court restated that evidence of gang affiliation is admissible for the purposes stated in Rule 404(b) provided that it pass through a Rule 403 analysis. Pleasant v. State, 701 So.2d 799, 804(¶ 21) (citing Hoops, 681 So.2d at 530-31). The evidence at issue in Pleasant consisted of testimony from a co-defendant who had entered a guilty plea midway through the trial. Id. at 804(¶ 17). Pleasant's co-defendant testified about Pleasant's membership in a gang, and "tear drop" tattoos under Pleasant's eye. Id. at (¶ 20). That evidence was held to be within the purpose of Rule 404(b). Pleasant's conviction and sentence were affirmed. Id.
¶ 21. In Goree, the State introduced evidence to prove Goree's membership in a gang. Goree, 748 So.2d at 838(¶ 38). The evidence presented included testimony from a friend of Goree who was also a witness to the assault for which Goree was charged. Id. at 831(¶ 5). A detective testified that Goree's tattoos were an indication of membership in a particular gang. Id. at 834(¶ 6). In rebuttal to Goree's defense witnesses who testified Goree was not involved in a gang, a second detective testified that Goree's tattoos indicated he was an enforcer in a particular gang. Id. at 835(¶ 9). This Court, in Goree, relied on Hoops, which stated that evidence of gang affiliation may be admissible to show motive under Rule 404(b) when passing through a Rule 403 balancing test. Goree, 748 So.2d at 836 (¶¶ 13-14) (citing Hoops, 681 So.2d at 530-31).
¶ 22. In a case similar to Goree, the Mississippi Supreme Court, in Brooks, held that it was reversible error to admit evidence of a defendant's tattoo of a grim reaper armed with a pitchfork, and rap lyrics discussing murder. Brooks, 903 So.2d at 699-700 (¶¶ 29-35). The victim there had been repeatedly stabbed in the neck with a fork. Id. at 693(¶ 3). The jury was told that the gang in which Brooks affiliated used the symbol of a six-pointed star and a pitchfork as its signs. Id. at 699(¶ 30). The lyrics which were presumed to be written by Brooks did not mention gangs, and did not discuss murder by use of a fork, but with a gun. Id. at 700(¶ 34). The trial judge did not make any attempt to weigh the probative value and prejudicial harm of such evidence. Id. at (¶ 35).
¶ 23. This Court has distinguished Goree as a case dealing with "whether evidence of a defendant's gang affiliation, such as gang-related tattoos, was admissible to prove his preparation, plan, intent, or motive in an aggravated assault case." Strohm v. State, 845 So.2d 691, 698(¶ 22) *349 (Miss.Ct.App.2003) (citing Goree, 748 So.2d at 830-34 (¶¶ 5-6)). In Strohm, there was "no mention of Strohm's gang affiliation in relation to his crime. . . ." Strohm, 845 So.2d at 698(¶ 22). Strohm's tattoos were used for the purpose of physical identification, not to connect him with the crime. Id. We held that such use of this possibly prejudicial evidence was not error. Id. Based upon the similarity of the evidence in Goree and Brooks, our reasoning in Strohm is applicable to both of those cases.
¶ 24. The supreme court has stated that evidence of "other crimes or bad acts is also admissible in order to tell the complete story so as not to confuse the jury." Palmer v. State, 939 So.2d 792, 795(¶ 9) (Miss.2006). In Palmer, the court reiterated that "the State has a `legitimate interest in telling a rational and coherent story of what happened.'" Id. (quoting Brown v. State, 483 So.2d 328, 330 (Miss.1986)). Though such evidence may be revealing or suggestive of other crimes, it may be admitted "where substantially necessary to present to the jury `the complete story of the crime.'" Id. (quoting Simmons v. State, 813 So.2d 710, 716 (Miss.2002)). The evidence must still pass through a Rule 403 analysis. Palmer, 939 So.2d at 795(¶ 10).
¶ 25. In the present case, the trial judge allowed the statement from Riley into evidence after hearing arguments from the parties on the admissibility of the statement. Although the trial judge did not state on the record that the testimony would be more probative than prejudicial, both parties were given the opportunity to argue their position. This implicit Rule 403 balancing test was sufficient. Hoops, 681 So.2d at 531.
¶ 26. One of the reasons the State expressed for eliciting the statement from Riley is because the jury would be left to speculate about why Riley was afraid of Hudson and the group of men with Hudson. The statement explains why Riley acted as a lookout during the crime but later notified police about the crime. Riley's inconsistent actions, without explanation, could leave the jury without a complete understanding of why Riley participated as a lookout. The State did not attempt in any way to connect Hudson's possible gang affiliation with the murder that occurred. The testimony elicited by the State was not an attempt to produce evidence of Hudson's possible gang affiliation or to connect any such affiliation with the crime. The trial judge was afforded broad discretion in determining whether to allow Riley's statement into evidence. The discretion entrusted to the trial judge was not abused by allowing Riley to say why he was afraid of the group of men, including Hudson.
2. Admissibility of Dog Tracking Evidence
¶ 27. Hudson argues that dog tracking evidence is generally too unreliable to be admissible and that one-hundred years of Mississippi case law should not be followed. He also argues that even if dog tracking evidence is admissible in general, the Labrador retriever in this case was too unreliable under current standards of admission.
¶ 28. The Mississippi Supreme Court addressed the admissibility of dog tracking evidence where a trainer and his German Shepherd tracked a suspect's scent to and from the crime scene. Byrom v. State, 863 So.2d 836, 878 (¶ 151) (Miss.2003). During the trial, the trainer testified that he and his police dog were certified through the Mid-South Police Canine Association and that they worked together at least one day a week to maintain the police dog's training. Id. at 879 (¶ 155). The police dog was trained in narcotics, tracking, and apprehension. *350 Id. The court held that admission of the dog tracking evidence was proper, as the police dog's qualifications were "beyond reproach, and they were well documented at trial." Id. at 879 (¶ 156).
¶ 29. In the present case, Officer Tanya Burton of the Choctaw County Sheriff's Department testified that she and the Labrador retriever police dog, Eli, trained together for two years. The first year of training was with the Choctaw County Sheriff's Department's K-9 Unit, and the second year at the Crystal Mountain Ridge Training Center in Hot Springs, Arkansas. Officer Burton also testified that Eli was certified through the National Drug Beat Canine Certifications and went through daily narcotics training after being certified. According to Officer Burton, Eli was trained on locating small articles or human tracking at least once a week, and had never failed in a human tracking search.
¶ 30. Rachel Paulette Wieble, the handler of Hadley Park, the purebred bloodhound who performed two searches, testified that she was a member of Search Dog South, an organization that, for the past ten years, had been assisting law enforcement in searches for missing persons and suspected felons. Wieble also testified that Hadley Park trained forty hours per month in human tracking. Wieble further testified that she and Hadley Park were trained by the North American Search Dog Network.
¶ 31. In sum, we find that the qualifications of the tracking dogs, as well as the handlers, were well documented at trial. Both dogs and their handlers had undergone various training and certification. Moreover, although the majority of Eli's training was focused on narcotics, he performed human tracking or small article locates at least once a week. Regarding reliability, Officer Burton testified that Eli had never failed in a human tracking search. Consequently, in light of this evidence concerning qualifications and reliability, we find that the court did not err in allowing the dog handler's testimony into evidence. This issue is without merit.
¶ 32. THE JUDGMENT OF THE CIRCUIT COURT OF OKTIBBEHA COUNTY OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE WITHOUT PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO OKTIBBEHA COUNTY.
LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES AND ROBERTS, JJ., CONCUR. ISHEE, J., DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., AND IRVING, J.
ISHEE, J., Dissenting in part:
¶ 33. The majority concludes that Hudson's conviction for capital murder should be affirmed finding no error with the trial court's admission of testimony by Riley regarding the gang affiliation of Hudson. Riley was a witness for the State. Hudson argued the court improperly admitted gang evidence because the State did not provide the proper foundation and the trial court failed to conduct an analysis pursuant to Rule 403 of the Mississippi Rules of Evidence. For the reasons discussed below, I conclude that Hudson's conviction should be reversed and remanded.
¶ 34. During direct examination, the State asked Riley why he was afraid of the group of men. Hudson promptly objected, and a bench conference was held. Hudson argued that the testimony that Riley was about to give, i.e., that the group of men *351 was in a gang, was inflammatory, irrelevant to the real issue of the case, and that any probative value of the testimony was outweighed by its prejudicial effect. Hudson further argued that there was no way of refuting Riley's testimony, and that to tell the jury that Hudson was in a gang without any proof of gang affiliation would cause irreparable damage. Citing Pleasant v. State, 701 So.2d 799 (Miss.1997), the State argued that the gang testimony was relevant as to whether Riley was afraid of the group of men and why he was afraid. After the court overruled Hudson's objection, the following exchange took place:
[THE STATE]: Why were you afraid of them?
[RILEY]: Because they was in a gang.
[THE STATE]: And what were you afraid was going to happen if you didn't do what they said? Explain to the ladies and gentlemen of the jury.
[RILEY]: I thought they was going to kill me or kill my family.
¶ 35. Hudson argues that the State's reason for introducing the gang testimony, i.e., that it was relevant to explain why Riley was afraid of Hudson, was insufficient to pass muster under Rule 404 of the Mississippi Rules of Evidence because, in order to be admissible, evidence of gang affiliation must relate to the motive of the crime. Hudson further argues that the gang testimony was admitted without laying a proper foundation and that the court failed to conduct an explicit or implicit analysis under Rule 403 of the Mississippi Rules of Evidence.
¶ 36. Rule 404(b) of the Mississippi Rules of Evidence provides in relevant part:
[E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Rule 403 of the Mississippi Rules of Evidence provides in part that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
¶ 37. In Hoops v. State, 681 So.2d 521 (Miss.1996), the court, in an aggravated assault trial, considered the admissibility of evidence of gang involvement. The court held that evidence of gang affiliation can be admissible to show motive under Rule 404(b) if it also passes a Rule 403 balancing test. Id. at 530. Although the trial judge in Hoops "failed to use the `magic words' that he did not find the danger of unfair prejudice to substantially outweigh the probative value of this evidence," the supreme court held that he "implicitly made that determination." Id. at 531. The supreme court reasoned that a Rule 403 analysis was implicitly conducted by the trial court because the trial court heard argument from both parties on the subject before ruling that the evidence was admissible to show motive. Id.
¶ 38. In the case at bar, when the trial judge overruled Hudson's objection, he did not state explicitly that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Nonetheless, the trial judge heard arguments from both parties concerning the admissibility of the evidence of gang affiliation. Consequently, I am not persuaded by Hudson's argument that the court failed to conduct an implicit Rule 403 analysis. *352 My review of this issue does not end here, however.
¶ 39. Hudson also contends that a proper foundation was not laid and that fear was not an appropriate reason for admission of evidence of gang affiliation. In Pleasant v. State, 701 So.2d 799, 799(¶ 2) (Miss.1997), Wayne Pleasant and Jeffrey Robinson were charged with capital murder for the killing of a convenience store clerk during the commission of a robbery. Robinson testified that he and Pleasant were members of a gang called the "Gangsters." Id. at 802(¶ 10). Robinson further testified that he shot the clerk because he was ordered to do so, and he feared that if he refused, he would be "violated" or physically attacked. Id. The State also questioned Pleasant about his "tear drop" tattoos under his eyes. Id. at 804(¶ 20). Pleasant argued that the aforementioned evidence was introduced for its prejudicial effect. Id. The supreme court held that the evidence was appropriately admitted as the trial court determined that it fell within the exception of Rule 404(b) to show motive, opportunity, intent, preparation, and plan, and the trial court implicitly determined that the evidence of gang affiliation passed a Rule 403 balancing test. Id. at 804(¶ 21). In the case at bar, however, Riley's testimony regarding gang affiliation does not show the motive for the crime as did the gang testimony in Pleasant. In Pleasant, the co-defendant asserted that he shot the store clerk because he was a gang member and was following gang order. Riley testified neither that he was in a gang, nor that he was following an order when he went with the men to the Millers' house.
¶ 40. In Goree v. State, 748 So.2d 829, 838(¶ 38) (Miss.Ct.App.1999), this Court found that the trial court erred in allowing the State to introduce evidence of the defendant's gang membership in an aggravated assault case. Although we recognized that a defendant's gang affiliation could be relevant in certain circumstances, we further found that it must be supported by adequate corroborating evidence, more than mere speculation, in order to overcome the resulting prejudice. Id. at 838. The reasoning of Goree applies to the case at bar.
¶ 41. Riley's bare assertion that he was afraid of the men because they were in a gang was the only evidence of gang affiliation introduced by the State at trial. The State asserts that the probative value of the gang testimony was "to complete the story," i.e., to explain to the jury why Riley served as the look-out. Nonetheless, as in Goree, the State provided no corroborating evidence to directly link Hudson's gang membership to the crime committed against Miller. With no such evidence linking the two, any relationship between the crime and Hudson's gang membership was mere speculation on the part of Riley. Furthermore, on cross-examination Riley stated his only basis for asserting Hudson was in a gang was from what one other person had told him. Based on Goree, speculation is not enough to overcome the prejudice created when a witness alleges that a defendant is a member of a gang. Consequently, this highly prejudicial testimony had no probative value to show motive. Therefore, I conclude that the trial court erred in admitting the gang testimony and would reverse and remand for a new trial.
KING, C.J., AND IRVING, J., JOIN THIS OPINION.