CARLTON, J., for the Court:
 

 ¶ 1. A Forrest County grand jury indicted Christopher Lamont Logan for capital murder for the beating death of thirteen-month-old Jaylon Kelly. After a jury trial, Logan was convicted of capital murder and sentenced to life in the custody of the Mississippi Department of Corrections (MDOC) without the possibility of parole. After denial of his post-trial motions, Logan perfected this appeal of his conviction and sentence.
 

 ¶ 2. On appeal, Logan raises two issues: (1) whether the trial court erred by allowing evidence of prior alleged bad acts and (2) whether there is sufficient evidence in the record to support his conviction.
 

 ¶ 3. Finding no error, we affirm the judgment of the trial court.
 

 FACTS
 

 ¶ 4. Logan and Tamika Gammage, the victim’s mother, began dating in August 2003. Around September or early October 2003, Gammage and Jaylon moved into an apartment Logan shared with his mother in Laurel. Gammage’s two older sons stayed with her and Logan occasionally. Jimmy Kelly fathered Gammage’s three sons, including Jaylon. Gammage’s daughter, Jakala, has a different father with whom she spent most of her time.
 

 ¶ 5. Logan and Gammage began experiencing problems around Thanksgiving of 2003. Logan disapproved of Gammage spending time in Ellisville with her mother, because he suspected her of going to Ellisville to spend time with her sons’ father. On one occasion, Logan and Gam-mage were visiting Gammage’s mother in Ellisville. Logan and Gammage disagreed about whether or not to go back to Hat-tiesburg, and an altercation ensued. Gam-mage gave the following testimony regarding the event:
 

 We — me and Chris — we was [sic] together when we went to Ellisville. The incident started in Ellisville. We was [sic] together, and he was trying to leave, and I wanted to stay, and so that’s when he — I hit him. He hit me. And he took off in my car....
 

 ¶6. Despite their troubled relationship, Gammage and Logan moved to Hatties-burg together in December 2003. Another altercation between Gammage and Logan occurred in December 2003. This altercation also revolved around Gammage visiting her mother and Logan’s suspicions that she planned to visit her sons’ father. When questioned about the second incident, Gammage testified:
 

 I was trying to go see my mom, and he accused me again of going to see the kids’ father. And so that’s when I had my little girl in my arm and my other kids, they was [sic] in the car too, and I was driving, and he jumped in, and he started punching me on the side of the face.
 

 Gammage and Logan separated for less than two weeks following the violent incident in December 2003 before reuniting in early January 2004.
 

 
 *596
 
 ¶ 7. On the morning of March 6, 2004, Logan changed and fed Jaylon while Gam-mage washed her hair and dressed for the day. According to Gammage, an acquaintance from Ellisville, identified as Mona McGilberry’s daughter, arrived at their apartment. Gammage made arrangements through the visitor to ride with the visitor’s friend back to Ellisville. Gam-mage’s two middle children were in Ellis-ville already, and only Jaylon and Jimmy, Gammage’s oldest son, remained in Hat-tiesburg with Gammage and Logan.
 

 ¶ 8. Because Jaylon was not dressed in time to ride with Gammage to Ellisville, Gammage left Jaylon with Logan and took Jimmy to Ellisville with her. According to Gammage, Logan intended to ride with friends later in the day to Ellisville and bring Jaylon to Gammage. When Gam-mage left the apartment at approximately 11:00 a.m., Jaylon seemed fine.
 

 ¶ 9. Gammage arrived in Ellisville at approximately 11:30 a.m. She telephoned Logan at approximately 1:00 or 1:30 p.m., and Logan’s friends had not yet come to the apartment to pick up Logan and Jay-lon. When Gammage spoke to Logan again at approximately 4:00 or 4:30 p.m., he was still waiting on transportation to Ellisville. Logan and Gammage talked again between 5:00 and 5:30 p.m., and Logan asked Gammage when she planned to return home. Gammage told Logan that she did not have transportation back to Hattiesburg until the next day, and according to Gammage, Logan became angry with her. Gammage testified that Logan was angry because he suspected her of staying in Ellisville to be with her sons’ father.
 

 ¶ 10. Gammage testified further that between 8:00 and 8:30 p.m., she and Logan spoke again. According to Gammage, Logan stated to her that she needed to “hurry up and get [her] a — home; come get [that] f-g baby before [Logan] left him.” Logan called Gammage a final time to inform her that Jaylon had stopped breathing.
 

 ¶ 11. Logan sought help
 
 from
 
 neighbors in the apartment complex when Jaylon stopped breathing. Logan and the neighbors were unable to resuscitate Jaylon, and one of the neighbors called an ambulance. Jaylon died at the hospital. Autopsy results showed that Jaylon died from internal bleeding following a massive liver laceration. Dr. Steven Hayne determined that Jaylon’s injuries were caused by blunt-force trauma to his abdomen.
 

 ¶ 12. At the time of his death, Jaylon had bruising to his abdomen, face, hands, and arms. His lungs had collapsed, and he had sustained multiple fractures. Further, Jaylon had scars on the backs of his legs that appeared to be from cigarette burns, which Dr. Hayne testified “had to be at least a month old, or they could have been much older than that.”
 

 ¶ 13. Logan contended that the bruises were caused by a fall down the stairs at the apartment. Several witnesses, including the forensic pathologist, the radiologist, and the emergency-room doctor, testified that they did not believe that the injuries could have happened this way. There were several objects found in the apartment which matched the bruising patterns on the child’s abdomen, including plastic coat hangers. Dr. Hayne testified that “something such as this could have produced this [bruising].” Dr. Hayne also testified that the bruising on the forearms, wrists, hands, and fingers were “consistent with defensive posturing injuries.” Logan testified at trial that he had lied when he told the police officers and others that Jaylon had fallen out of bed.
 

 ¶ 14. Logan was taken into custody at the hospital where Jaylon was taken. A
 
 *597
 
 jury found Logan guilty of capital murder, and he was sentenced to life in the custody of the MDOC without the possibility of parole.
 

 DISCUSSION
 

 I. EVIDENCE OF PRIOR BAD ACTS
 

 ¶ 15. Mississippi Rule of Evidence 404(b) provides that “[ejvidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.”
 
 See Hudson v. State,
 
 977 So.2d 344, 347-48 (¶18) (Miss.Ct.App.2007). The prosecution argued that this evidence was relevant to show motive and intent. The defense argued that the proof was not probative of any material issues and was more prejudicial than probative and, thus, barred by Mississippi Rule of Evidence 403.
 

 ¶ 16. This Court reviews the admission of evidence by the trial court utilizing an abuse-of-discretion standard of review.
 
 Mingo v. State,
 
 944 So.2d 18, 28 (¶ 27) (Miss.2006) (citing
 
 Parks v. State,
 
 884 So.2d 738, 742 (¶ 9) (Miss.2004)).
 

 ¶ 17. On the day of trial, the defense filed a motion to exclude evidence that Logan had previously committed acts of violence against Gammage. The motion was heard when the State sought to introduce this evidence during the testimony of Gammage.
 

 ¶ 18. The Court allowed the prosecution to ask questions about Logan’s prior conduct. Logan in his trial testimony admitted that he had taken some aggression out on Gammage, including hitting her. He also testified that he was upset about her contact with the father of her sons.
 

 ¶ 19. In
 
 Hudson,
 
 the Court found the following:
 

 An appellate court does not conduct a de novo review of evidence under Rule 403.
 
 Jones v. State,
 
 904 So.2d 149, 152 (¶ 7) (Miss.2001). Trial courts have the discretion to determine whether potentially prejudicial evidence possesses sufficient probative value.
 
 Id.
 
 This determination on admissibility is highly discretionary because Rule 403 “does not mandate exclusion but rather provides that the evidence may be excluded.”
 
 Id.
 
 Our review is confined to “simply determine whether the trial court abused its discretion in weighing the evidence.”
 
 Id.; see also Jackson v. State,
 
 784 So.2d 180, 183 (¶ 9) (Miss.2001). A Rule 403 analysis “asks only that a judge rely on his/her own sound judgment.”
 
 Jones v. State,
 
 920 So.2d 465, 476-77 (¶ 33) (Miss.2006) (citing
 
 Jenkins v. State,
 
 507 So.2d 89, 93 (Miss.1987)).
 

 Hudson,
 
 977 So.2d at 347 (¶ 17).
 

 ¶ 20. We hold that the trial court in this case did not abuse its discretion in allowing the testimony. Accordingly, this assignment of error is without merit.
 

 II. SUFFICIENCY OF THE EVIDENCE
 

 ¶ 21. Logan argues in his brief that the trial court erred in denying his motion for a judgment notwithstanding the verdict (JNOV) because the evidence presented at trial was legally insufficient to support the jury’s verdict. Regarding the legal sufficiency of the evidence, the supreme court in
 
 Bush v. State,
 
 895 So.2d 836, 843 (¶ 16) (Miss.2005) explained:
 

 [I]n considering whether the evidence is sufficient to sustain a conviction in the face of a motion for directed verdict or for judgment notwithstanding the ver-
 
 *598
 
 diet, the critical inquiry is whether the evidence shows beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.
 

 (Internal citation and quotation marks omitted). Further, the appellate court should examine the evidence in the light most favorable to the prosecution and determine whether “any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.”
 
 Id.
 
 (citation omitted). This Court will reverse a conviction only if, upon examination of the evidence, we find that the evidence “point[s] in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty.”
 
 Id.
 
 (citation omitted). However, this court will affirm even when the evidence is of such quality and weight that “reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense.”
 
 Id.
 
 In sum, a reversal on the grounds of insufficient evidence means that an acquittal was the
 
 only
 
 proper verdict for the defendant.
 
 Id.
 
 at 844 (¶ 18).
 

 ¶ 22. The only reasonable explanation for the child’s injuries was that they were caused by blunt-foree trauma. Logan’s explanation was both unreasonable and refuted by all the medical experts and testimony. Logan was also the only other person present with Jaylon and the only person with access to Jaylon at the time who could have inflicted the injuries to the child. We consequently find that the evidence supporting the verdict is more than sufficient to support the jury’s verdict and further find no merit to this assignment of error.
 

 ¶ 23. In conclusion, the Court finds no merit to any of the issues raised on appeal, and therefore, affirms the judgment of the circuit court.
 

 ¶ 24. THE JUDGMENT OF THE CIRCUIT COURT OF FORREST COUNTY OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO FORREST COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR.