

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-23-1997

# USA v. Vaulin

Precedential or Non-Precedential:

Docket 97-1333

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"USA v. Vaulin" (1997). *1997 Decisions.* Paper 280.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/280

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 23, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1333

UNITED STATES OF AMERICA

v.

MOSHE VAULIN

      Appellant

Appeal from a Judgment of Conviction
From the United States District Court
for the Eastern District of Pennsylvania
(No. 96-cr-00267-2)

Submitted Pursuant to Third Circuit LAR 34.1(a)
December 4, 1997

BEFORE: COWEN and McKEE, Circuit Judges, and
WEIS, Senior Circuit Judge

(Filed December 23, 1997)

      Jeffrey M. Miller, Esq.
      Nasuti & Miller
      21 South 5th Street
      The Bourse, Suite 860
      Philadelphia, PA 19106

      Attorney for Appellant

      Christopher R. Hall, Esq.
      Office of United States Attorney
      615 Chestnut Street
      Suite 1250
      Philadelphia, PA 19106

      Attorney for Appellee

OPINION OF THE COURT

PER CURIAM:

The defendant appeals from his conviction for two counts
of receipt of stolen property in violation of 18 U.S.C. SS 371
and 2315. He alleges that the district court erred in
denying his motion for a mistrial. For the reasons that
follow, we will affirm.

The district court addressed the issue now before us in
ruling upon the defendant's post-trial motions under Fed.
R. Crim. P. 29(c) and 33, and we affirm substantially for the
reasons set forth by the district court in its April 21, 1997
memorandum. However, given the nature of the challenged
prosecutorial conduct, we think it appropriate to
supplement what the district court has already said about
this case.

I.

Defendant and his codefendant, Morris Gershtein, each
operated jewelry stores in "Jewelers Row" in Philadelphia,
Pennsylvania.1 The Government charged that the defendant
and Gershtein entered into a relationship with Harold
McCoy, whereby the latter would engage in a series of
"smash and grab" robberies of jewelry stores in Virginia,
North Carolina, Texas and elsewhere, and sell the proceeds
of those robberies to defendant and Gershtein. McCoy was
arrested in Texas for robbing a jewelry store there and
transferred to Philadelphia, where he was charged in
relation to several "smash and grab" robberies. Thereafter,
McCoy entered into a plea agreement wherein he agreed to
cooperate with the police in their investigation of Vaulin
and Gershtein. As part of his cooperation McCoy wore a
"body wire" and recorded conversations with Vaulin and

_____

1. We need not set forth the facts in great detail as they are adequately
summarized in the district court's memorandum opinion. We will,
therefore, reiterate only those facts which are pertinent to the issue
upon
which we wish to elaborate.

2

Gershstein while selling them watches that appeared to have been stolen from other jewelry stores.[2] Vaulin was arrested almost immediately after purchasing the watches from McCoy and proceeded to a jury trial jointly with Gershtein on the aforementioned charges.

During the course of that trial, the Government called McCoy as a witness. On redirect examination, the Assistant United States Attorney asked McCoy whether he had received any threats while in prison because of his cooperation with the Government. McCoy answered that he received many death threats from inmates who are from Philadelphia. The prosecutor then asked McCoy why an inmate might threaten to kill him, but defense counsel objected and the court called counsel to sidebar because of its concern over the obvious dangers of this line of questioning. At sidebar, the prosecutor conceded that the threats did not come from Vaulin or Gershtein, and that these defendants had nothing to do with any threats. The court denied the defense motions for a mistrial, and asked the Government to clarify its question to eliminate any perceived connection between the threats and the defendants. The Assistant U.S. Attorney then asked McCoy: "You were threatened at Lewisburg but it had absolutely nothing to do with these defendants here, is that correct?" However, McCoy responded, "it was just basically-- directly, I am going to say no, not directly." App. at 124. Another sidebar ensued during which defendants renewed their motion for a mistrial fearing that McCoy's answer implied that the defendants had threatened McCoy indirectly. Nonetheless, the court once again denied that motion.

Following this sidebar, the court instructed the jury as follows:

> This is by way of clarification. At sidebar here, the Government and the attorneys for the defendant stipulated and agreed that these two defendants that are in this courtroom on trial, had nothing whatsoever

_____

2. In actuality, the watches that he sold to the defendant and Gershtein were provided McCoy by the FBI for use in this sting operation.

        to do with any threats that this man may have
        received. That is to be clarified and made clear.

App. at 126. It is this exchange upon which we comment.

II.

It is obvious that this case is not like those cases
exemplified by U.S. v. Gonzales, 703 F.2d 1222 (8th Cir.
1993), in which evidence of a threat to a witness can be
linked to a defendant and therefore tends to establish a
defendant's consciousness of guilt. In that situation, "the
probativeness of the death threat [outweighs] any danger of
undue prejudice." Id. at 1223. Here, the Government
concedes that none of the death threats that McCoy
received came from either of the defendants who were on
trial. Rather, the threats were apparently the result of a
prison code that requires inmates to be antagonistic to any
inmate who cooperates with the Government in criminal
prosecutions.

The Government attempts to justify its inquiry here by
arguing that it was appropriate to bring out McCoy's
concerns about remaining in prison in order to counter
defense counsels' attempt to cross-examine McCoy about
the "sweet deal he had made with the Government." See
Appellee's Br. at 11. However, we are unpersuaded by the
logic of this explanation.

It goes without saying that persons in prison would
prefer not to be there and may, therefore, avail themselves
of an opportunity to reduce the amount of time they have
to spend in prison whether or not they are receiving any
threats while they are incarcerated. Thus, the fact of
incarceration is, by itself, all that is needed for the average
person to understand why anyone would enter into a
"sweetheart deal" to shorten a period of incarceration. It
also should go without saying that any prosecutor,
regardless of his or her experience, ought to appreciate that
when a cooperating witness is asked about death threats
that he or she has received while in prison, a reasonable
juror might readily assume that the defendant is behind
such threats. Common sense would cause a juror to
wonder why else the prosecutor would ask such a question.

4

Accordingly, the prosecutor's opening of Pandora's box here is as improper as it is ill advised. It invited the jury to return a verdict based upon an inappropriate and erroneous assumption, and then beckoned to them to accept that invitation by exercising the common sense that most trial courts instruct them to utilize while deliberating.

Fed. R. Evid. 401 defines "relevant evidence" as follows:

> evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Despite the instant prosecutor's assertion to the contrary, we are hard pressed to see how, under the circumstances here, evidence that an inmate received death threats that are no way connected to a defendant on trial is relevant during the course of that defendant's trial.

This inquiry may have had some highly attenuated, theoretical relevance, because it bolstered the prosecutor's argument that the witness would rather have been outside of prison than inside of it. However, even assuming that such an argument would allow these questions to survive scrutiny under Rule 401, they still would fail the balancing test imposed by Fed. R. Evid. 403. The probative value is so minimal and the risk of prejudice so certain that it fails that test. The district court correctly sustained the defense objection to it.

The Government attempts to justify the questions regarding death threats by relying upon U.S. v. Frankenberry, 696 F.2d 239 (3d Cir. 1982) cert. denied, 463 U.S. 1210 (1983), and U.S. v. Vastola, 899 F.2d 211, 235 (3d Cir. 1990) vacated on other grounds, 497 U.S. 1001 (1990). See Appellee's Br. at 11-12. However, our holdings in those cases do not ameliorate our concern over what the prosecutor did here. In both Vastola and Frankenberry, the fear that raised the spectre of undue prejudice was testimony that was elicited to explain a witness's participation in the Witness Protection Program. Although participation in that program can, under some circumstances, unfairly suggest a defendant's dangerousness to a jury, that was not the situation in

either of those cases. Moreover, in Frankenberry, evidence of the witness's participation in the Witness Protection Program was relevant to explain to the jury that the Government was financially aiding the witness and conferring a benefit upon him. Thus, it was not only appropriate for this testimony to be elicited by the prosecutor, it was advisable and perhaps even required. We emphasized that "[t]he government explains that it elicited [the witness's] testimony . . . because it was relevant that it was financially aiding him and to rebut any inference that the government was buying his testimony." Id. at 239. In Vastola, we cited Frankenberry and noted that even when such evidence is admissible, it "is a matter that must be handled delicately." 899 F.2d at 234. The circumstances of this prosecution fell short of the mark needed to justify eliciting testimony from which a jury would infer a defendant's dangerousness.

Nevertheless, for the reasons stated by the district court, we do not believe that this line of questioning supports the defendant's request for a new trial. As noted above, the trial judge immediately gave a strong curative instruction informing the jury that the defendants "had nothing whatsoever to do with any threats" that the witness had received. Although there are cases where the strongest of curative instructions remains insufficient to "unring" the bell, we do not believe that McCoy's testimony is such that any prejudice that resulted from it was not eliminated by the district court's immediate, direct, and insightful action. "We must presume that a jury will follow an instruction to disregard inadmissible evidence . . . unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the impact of the evidence would be devastating to the defendant." U.S. v. Thornton, 1 F.3d 149, 157 (3d Cir. 1993).

Moreover, after the question was asked, and the curative instruction given, the prosecutor did not return to the subject nor attempt to exploit McCoy's answer to the questions. The district court did not conclude that the prosecutor engaged in intentional misconduct in asking these questions and this record does not cause us to

6

disagree with that conclusion. Nevertheless, we would hope that, in the future, the Government would exercise better judgment in conducting an examination of a witness such as McCoy and would not bring out this kind of testimony unless it is relevant to some issue in the case.

III.

Accordingly, for the reasons set forth in the memorandum of the district court, we will affirm the judgment of conviction.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

7