*851 FAIR, J.,
dissenting:
¶ 63. The case against Jordan consisted of the accounts of two witnesses—Smith and Baker, both of whom fingered Jordan long after the fact, and only after being arrested themselves. There was no physical evidence implicating Jordan, nor was any murder weapon recovered.
¶ 64. But at Jordan’s trial, the prosecution was allowed to bolster its case through the extensive use of a “rap video” featuring one of Jordan’s codefendants, Charles Henderson. The video—in which Jordan played only a bit part—was for a song where the narrators violently threatened, and then killed, an old friend who had turned state’s evidence.
¶ 65. The problem is that the prosecution never proved that the video was intended to threaten the witnesses in this case. It contains no explicit threats against them, and the song contains myriad details that do not match the known facts of the case. It was never even shown when the video was made.
¶ 66. The trial judge allowed the video into evidence without, so far as the record reveals, actually watching it. Instead, he relied on the testimony of a police investigator as to the contents—testimony which, viewed in the best possible light, consisted of errors, exaggerations, and unsubstantiated opinions. At worst, the investigator just lied about what the video showed. Throughout the trial, the prosecution made inflammatory and highly prejudicial claims about the video that turned out to be unsubstantiated.
¶67. The majority would affirm Jordan’s conviction based on the assertion of a procedural bar. Although I agree that Jordan’s attorney could have objected more forcefully and articulately, he did present all of the necessary arguments to the trial court. With all due respect to'the majority, allowing the video and accompanying testimony into evidence was clearly error, and it was preserved for appeal.
¶ 68. The admission of the video and the associated, unfounded allegations of the prosecutors denied Jordan a fair trial. I would reverse his conviction and remand for a new trial.
The Music Video
¶ 69. I begin with a discussion of the video, to explain why it does not “speak for itself’ as a threat against the witnesses in Jordan’s trial. I also do it to rebut numerous false claims about the video’s contents which were made by a prosecution witness, and to place Jordan’s role in context—he was one of about ten people who contributed to the video, and so far as the proof showed, his involvement was minimal.
¶ 70. The video is almost six minutes long and features performances by Henderson and “King Chris.” A third man is credited as the director. There are five or six extras who are uncredited— Jordan was one of them. Baker and Smith testified that they “recognized” Henderson, Jordan, and “King Chris,” though their testimony differed as to whether his name was Chris King or Chris Randall. Smith and Baker did not seem to know any of the extras (other than Jordan).
¶ 71. The video was shot with a high-definition camera, which at times tracks and pans. It includes numerous “artsy” shots—the camera tracks across a chain link fence, Henderson appears silhouetted in a doorway, a man (who is probably Jordan) smokes in the dark, Henderson shakes his head sadly in slow motion, etc. The music and vocals were recorded separately from the video, presumably in a studio, and are dubbed over. The video seems to have been assembled from ten or so scenes that were filmed separately and spliced together, back and forth through *852 out, as well as a number of isolated shots. Henderson is seen wearing three different sets of clothes, suggesting that the filming was done over a period of time. The lip-synching is coordinated with the vocals and music, apparently requiring that the performances at each filming location be scripted out in advance. I emphasize the production values and the number of people involved because they suggest that the video was not created just as a pretext to threaten Smith and Baker.
¶ 72. Jordan is just one of the uncredited extras. He appears on screen for a total of about thirty seconds, in only one of the major settings, sitting at a table to Henderson’s right. Another extra stands to Jordan’s right, doing the same things Jordan does. And most of the time Jordan is at the periphery as the camera focuses on one of the rappers; often only Jordan’s arm is visible. When Jordan can be seen, he sits and drinks or smokes, or he mouths the words to the chorus and mimes along. He is also apparently seen in one of the “establishing” shots at the beginning, sitting on a couch in a dark room smoking what appears to be a marijuana cigarette.[8] Some of the other extras have speaking parts in the “short film” at the end, but Jordan does not appear there. As far as I can tell, Jordan is never actually heard on the video.
¶ 73. Turning to the lyrics of the song, I do not dispute the description of them as threatening—they are also very profane and offensive. The basic outline fits—the narrators have been betrayed by a friend who turned state’s evidence. But otherwise the story differs in important respects.
¶ 74. The first half or so of the song is performed by Henderson, and King sings the remainder. Both sing in the first person and both relate the same basic events as happening to them[9]—that they were falsely implicated by a friend-turned-police-informant, that the friend thinks they are ignorant of his betrayal, that he shook them hand but would not look them in the eyes, that they have been praying “a hundred times a day.” Toward the end of the song, King says he has been praying because he wants to murder the informant.
¶ 75. Not only does the song not contain explicit threats against Smith or Baker, but it is littered with references to incidents and people that appear to have nothing to do with this case. The encounter where the informant shook the narrators’ hands but would not look them in the eye is referred to over and over in the song (both Henderson and King sing about it, and it forms most of the chorus), but no one testified it had actually happened in real life. Henderson refers to some kind of event involving an unnamed woman, and the informant’s sister making “statements” (presumably to the police; he makes a gesture like he is writing). He also makes *853 the puzzling complaint that the informant refuses to “speak up on my parents just because I won’t speak up on yours.” Henderson describes a more intimate relationship with the informant than was attested in this case: they were “best Mends from elementary” school, and Henderson used to give the informant money and food. He suggests that the informant needed charity because he was a poor drug dealer (he had no “hustle skills”). Henderson believes he was betrayed because of “jealousy and envy,” which the informant had concealed; King says the informant did it “just to save himself.” Henderson refers to the informant’s story as “bulls* * * ” and King says he wants to kill the informant without “even asking him why he lied.”
¶ 76. While it was admitted that Baker and Smith were friends of Henderson and Jordan, and they had all attended the same elementary school, no one testified that any of them had the sort of intimate friendship that the song is about. Neither Smith nor Baker described their Mend-ships with Henderson or Jordan as particularly close, and they seemed to barely know King, much less why he would want to kill them.[10] Smith had lived out of state for seven years, and had by his own admission no contact with Henderson or Jordan since moving away. Baker (who the prosecution seemed to think the song was directed to), when asked how he knew Henderson, stated: “A friend of mine I knew through football and we played football together through elementary and junior high.” He said he knew Jordan the same way—from playing football with him. Baker never said or even suggested that Henderson or Jordan was ever his best friend. And Baker had attended high school in Ohio and had only been back in Mississippi for a few years, so it is unlikely he ever received Henderson’s charity. He certainly did not testify to it.
¶ 77. There is also a physical description of the informant in the song, that he had “duck lips” and “rotten teeth,” for what that is worth. If this was intended to describe Smith or Baker, it was never stated on the record. Also, the informant was played by an actor in the video, but, again, there is no record evidence that the actor resembled one of the witnesses.
¶ 78. Jordan is not even present on screen when the most threatening verses are performed—in fact, most of them are performed by King rather than Henderson. And Jordan does not appear at all in the “murder scene” at the end. From the parts where Jordan appears, it is arguable whether he necessarily knew the song was about a police informant and not just an unspecified betrayal by a friend.[11]
¶ 79. I would also emphasize that the date the video was recorded was never established. The investigator testified that the copy of the video he saw was uploaded to YouTube in April 2013, which is approximately a year after the first witness implicated Jordan and Henderson. But the date that a video is published is not necessarily the date it was composed or filmed.
¶80. In fact, April 2013 is not even necessarily the first date it was first pub *854 lished. YouTube is a website that, famously, allows anyone to publish videos for public viewing. But there is little to prevent a video from being published more than once; videos on YouTube are frequently published—and republished—by individuals with no connection to the video’s creator, who have copied them from elsewhere. See Viacom Intern., Inc. v. YouTube, Inc., 676 F.3d 19, 32 (2d Cir.2012) (noting that surveys had found that significant percentages—between 80 and 50 percent—of videos on YouTube contained material published or republished without the permission of the copyright holder).
¶ 81. The fact that someone uploaded a copy of the video to YouTube in April 2013, without more, provides little or no evidence as to when it was filmed—or even when it was first published. For all we know, the video could have been filmed years before. The video is supposed to be relevant because Jordan’s decision to participate amounted to a threat against witnesses planning to testify against him, and that evidenced Jordan’s consciousness of his own guilt. Regardless of how the video is interpreted, it could not evidence Jordan’s consciousness of guilt if it was made before the crime.

The Investigator’s Testimony

¶ 82. The video was offered and accepted into evidence during the testimony of a Mississippi Bureau of Investigations investigator, who purportedly established the foundation for admitting it. His testimony is problematic to say the least.
¶ 83. The investigator’s very first statement about the video contains a material, highly prejudicial misstatement of fact. The prosecutor asks (with my emphasis added):
Q, [I]n your discussions with Mr. Baker and Mr. Smith, did they give you any reason why they were hesitant to come forward and give you information or give Meridian Police Department information before you actually talked to them?
A. Yes, sir.
[A defense objection was overruled.]
Q. So did you—were you able to independently verify that they had some reason to be fearful about giving testimony?
A. Yes, sir.
Q. And how did you do that?
A. YouTube video.
Right off the bat, the investigator testifies that the music video was the reason Baker and Smith did not “come forward” sooner—yet, as the State acknowledges, later he testified that it was not published until almost a year after they had implicated Jordan. Neither Smith nor Baker claimed to have seen the video before that. Even if the video had properly been admitted, this misstatement of fact was egregiously prejudicial.
¶ 84, The investigator, laying a foundation for the video’s introduction into evidence (in the presence of the jury over repeated defense objections) then testifies that the video contains a reenactment of the killing of Aaron Coleman, who Jordan was on trial for murdering. It does not. He goes on to say that the “stars” of the video are Jordan and Henderson, in that order. Again, that is obviously not true; the “stars” are Henderson and his co-rapper, Chris King, Henderson sings about two thirds of the song and King the remainder. Jordan sits next to them at a kitchen table in a few scenes.
¶ 85, Then, when asked what Jordan is “doing on the video,” the investigator replies that “Mr. Jordan and Mr. Henderson get a witness, which is Mr, Baker, and they get.him out in the woods and kill him for ratting on them.” Again, this is materially false—even if we assume that the *855 investigator was attempting to convey his interpretation when he said that the victim was Baker, Jordan does not appear at all in the scene he is describing, much less take the lead as he suggests. Then the prosecutor asks whether the video is a threat, and the investigator says, matter of factly, that it is.
¶ 86. The trial judge then admitted the video into evidence (over numerous objections which I have omitted from the narrative above). And I cannot blame him— had the investigator’s testimony been accurate, the video unquestionably would have been admissible. But, again, as far as the record reveals, the trial judge did not watch the video before admitting it into evidence. And for reasons that may have been puzzling at the time, the prosecution chose not to publish the video to the jury during the trial itself (it was provided to them for their deliberations). The prosecution immediately began backtracking from some of the claims the investigator had made, and on appeal the State seems to accept that they are false.
¶ 87. Still, the prosecutors continued to refer to the music video throughout the trial. Baker and Smith both testified that they had seen it—but after they implicated Jordan, not before. Both interpreted it as a threat, but their subjective interpretations are not evidence of Jordan’s consciousness of guilt. Neither said that Jordan or anyone else had expressly used it to threaten them.
¶88. Then each of the defense witnesses was cross-examined about the video, including Jordan himself, who was forced to try to explain the song, verse by verse, despite having nothing to do with writing it. The prosecution even repeatedly insisted that the video showed Jordan “flashing signs”—insinuating that he was a gang member or that there was some other hidden meaning to his gestures during the song. This claim appears to be completely unfounded, as the .majority seems to acknowledge. Jordan’s gestures just match the lyrics of the song—he points to his eyes (“Can’t even look me in the eyes”), displays a middle finger (“F* * * all y’all”), and clasps his hands (“A n* * *a pray a hundred times a day”). If these gestures have any meaning beyond the obvious, the prosecutor failed to establish it. And in closing argument, the prosecutor made the false claim that the song refers to the FBI, which she likened to the Mississippi Bureau of Investigations (MBI) and the investigation of Jordan, when in fact the song mentions neither.

The Issue Was Preserved

¶89. Jordan contends on appeal that the video was erroneously admitted as evidence of prior bad acts, under Mississippi Rule of Evidence 404, and that, even if it was admissible under Rule 404(b), its probative value was far outweighed by unfair prejudice under Rule 403. Jordan is manifestly correct on both of these points.
¶ 90. The State attempts to dodge the issue by asserting a procedural bar: it contends that Jordan failed to cite Rule 404 or challenge the prejudicial impact of the video at trial. It is wrong on this point; the arguments were presented to and addressed by the trial judge.
¶ 91. As previously noted, the prosecution introduced the video during the testimony of a police investigator. Jordan’s initial objection was indeed that the video was irrelevant and that there was no foundation for its admission. He also complained that, although the video had been disclosed in discovery, the prosecutor had never given him any reason to expect that it would be introduced into evidence under the theory that it was a threat against the witnesses.
*856 ¶ 92. In response, the prosecutor promised that one of the subsequent witnesses would establish the foundation, and the trial judge seemed to rule that he would take up the issue of admitting the video when that witness testified. The prosecutor then interjected and claimed he could establish a foundation through the police investigator, and Jordan’s attorney asked that it be attempted without the jury present. The judge refused, stating, “I can rule,” and brought the jury back in. The trial judge then allowed the investigator to testify about the video over another objection. The investigator made numerous false statements of fact in his testimony, as detailed above. Jordan’s attorney objected repeatedly before expressly asking for a continuing objection and receiving permission to make a motion on the issue at a later time. And as the testimony continued, he attempted to flesh out his objection, but the prosecutor shut him down by saying he had “about had it with the speaking objections.”
¶ 98. It is true that Jordan’s initial arguments only explicitly stated that the evidence was irrelevant, without clearly stating that he was making a Rule 404/403 objection. But that seems to have been implicit, if the evidence was being offered as proof of consciousness of guilt, which is admissible only through Rule 404(b). Unfair prejudice was obvious, and, as the supreme court has stated, a Rule 403 balancing test must be undertaken before admitting all evidence—Rule 403 is the “ultimate filter through which all otherwise admissible evidence must pass.” McKee v. State, 791 So.2d 804, 810 (¶ 22) (Miss.2001). “Where the specific grounds for objection are apparent from the context, a general objection is sufficient to preserve the error for appeal.” Carter v. State, 722 So.2d 1258, 1261-62 (¶ 13) (Miss.1998).
¶ 94. Regardless, Jordan asked for and received permission to elaborate on his objection later. And immediately after Baker and Smith had testified and failed to establish the predicate the prosecutor and the investigator promised they would, Jordan unambiguously argued that the video was improperly admitted as evidence of prior bad acts in violation of Rule 404 and that it was improperly allowed in under Rule 403. He cited Brooks v. State, 903 So.2d 691, 699-700 (¶¶ 29-35) (Miss.2005), mentioning the pages and paragraphs, which addresses a Rule 403/404-based challenge to the introduction of the defendant’s rap lyrics and tattoos. Jordan also cited Hudson v. State, 977 So.2d 344, 348 (Miss.Ct.App.2007), where the same rules were at play. When the prosecutor was asked for a response, he stated only that he “had already responded to that motion a couple times.” The trial judge then addressed the Rule 403 argument on its merits:
BY THE COURT: All right. Well, specifically, the Court finds that nobody— nobody has testified or in any way insinuated that Mr. Jordan wrote the lyrics to this—to the video. He was a star player in the video. There is testimony and evidence that relates the consensus message that’s described in the video to the two witnesses that were testifying against Mr. Jordan. That’s relevant. That’s probative. So your motion—your objection to that video is again denied. It is in evidence, and it will be played before the jury.[12]
The Rule 403 argument was again expressly presented in Jordan’s motion for a new trial. The motion states: “The Court erred by [admitting the YouTube video] over continuous objections ... without ever having viewed it, based on hearsay, *857 relevance and Rule 403, without weighing the balancing test as to prejudicial effect versus probative value [sic].”
¶ 95. Jordan presented both the Rule 404 and Rule 403 arguments during the trial. Respectfully, I cannot join the majority when it concludes that these issues are barred because Jordan never presented them to the trial judge for decision.

The Video and Other Evidence of Threats Were Erroneously Admitted

¶ 96. I do agree that evidence the defendant threatened the witnesses against him is admissible to show consciousness of guilt. See Mattox v. State, 243 Miss. 402, 413, 137 So.2d 920, 923 (1962). I also agree that the video was relevant in the sense that it was “probative of witness intimidation”—meaning that it was some evidence making witness intimidation more likely. But for any evidence of witness intimidation to be admissible, the prosecution must prove that witness intimidation actually occurred. Otherwise, the evidence is improperly admitted under Rules 404 and 403.
¶ 97. Of course it is possible that Jordan had much more involvement in the song than he appeared to, that he and Henderson put the video together to intimidate the witnesses in this case, that they changed the details of the narrative to give themselves plausible deniability, etc., just as the prosecution alleged. That may very well be what happened, but the prosecution failed to prove it.
¶ 98. It has been speculated that Baker and Smith knew things we do not, and so perhaps their subjective interpretations of the video were supported by real, objective evidence. And perhaps the investigator discovered something in his investigation that he neglected to mention in his testimony at trial. But witnesses are supposed to testify to facts, not conclusions, and the gaps cannot be filled with speculation.
¶ 99. The State also indulges in a specious probability argument, contending that it is unlikely that Henderson would write a song about his “best friend from elementary” turning him in and then subsequently be implicated in a crime by someone he had attended elementary school with. We have no way of knowing what the odds actually are, since we do not know how many people attended Henderson’s elementary school, who Henderson associated with, etc. More importantly, we do not know how many songs Henderson wrote or performed where some detail like “best friend from elementary” could be found. Ironically, the prosecutor addressed the fallacy of cherry-picking when he responded to Jordan’s attorney’s arguments concerning the victim’s own rap songs. Coleman had written lyrics stating that he feared his friends and that his greatest enemy rode around in the passenger seat of his car (Jordan alleged this was supposed to be Baker). He had even written violent rap lyrics threatening unnamed Mends who had betrayed him.[13] The prosecutor argued (in rebuttal closing, presumably to avoid the obvious response that the prosecution had done the same thing to Jordan):
[Jordan’s attorney] says, I want you to look at the—he calls it the “rap sheet.” That—I assume what he means is the— are the rap lyrics that are written down there. Now, what’s the purpose of that? I ask you, what is the purpose of, number one, introducing any of that? I *858 guess he would say, Well, it’s because it says somewhere in a big, you know, thick sheet of lyrics—it says something about somebody riding on my right side. But the truth of the matter is, the reason he has put that in there and the reason he’s read all of that to you is to try and diminish Aaron Coleman. The reason that he read that to you is so that you would think, well, he wasn’t such a nice guy.
¶ 100. Violence and retribution are spectacularly common themes in rap music. In a survey of rap songs from albums with over 1,000,000 sales (not limited to so-called gangster rap), one scholar found themes of violence in 65% of the songs, and violent retaliation in 35%. Charis E. Kubrin, Gangstas, Thugs, and Hustlas: Identity and the Code of the Street in Rap Music, 52 Social Problems 360, 369 (2005). After reviewing more than 400 popular songs, she observed: “In cases of snitching or disrespect, violent retaliation is portrayed as punishment and is characterized as an acceptable and appropriate response as part of the street code. In many instances violent retaliation is claimed to be not only appropriate but also obligatory.” Id. at 374. For snitching in particular, “rappers are not at all reluctant to administer capital punishment.” Id. “Entire songs may be devoted to warning others about the repercussions of snitching and testifying.” Id. Other scholars have observed that “[ajrguably, the anti-snitching message has emerged as a central theme within hip-hop.” Rachael A. Woldoff & Karen G. Weiss, Stop Snitchin’: Exploring Definitions of The Snitch and Implications for Urban Black Communities, 17 Journal of Criminal Justice and Popular Culture 184,190 (2010).
¶ 101. Commentators have also observed that rap music is especially vulnerable to prosecutorial misuse because jurors often hold it in disregard or are unfamiliar with the genre’s conventions. See, e.g., Andrea L. Dennis, Poetic (Injustice? Rap Lyrics as Art, Life, and Criminal Evidence, 31 Colum. J.L, & Arts 1 (2007).
¶ 102. Introducing evidence of threats requires real proof of threats—because threats against a witness are supposed to be proof of the defendant’s consciousness of his own guilt. Evidence of consciousness of guilt amounts to evidence of guilt itself. McClendon v. State, 387 So.2d 112, 115 (Miss.1980). Courts should not and do not admit such evidence when it is founded on speculation.
¶ 103. In United States v. Hayden, 85 F.3d 153, 159 (4th Cir.1996), the Fourth Circuit Court of Appeals held that to be admissible, evidence of threats against the witness must be “(1) ... related to the offense charged and (2) ... reliable.” In United States v. Smith, 629 F.2d 650, 651-52 (10th Cir.1980), the Tenth Circuit noted: “Evidence of threats to a prosecution witness is admissible as showing consciousness of guilt if a direct connection is established between the defendant and the threat.” (Emphasis added).
¶ 104. In State v. Marlar, 94 Idaho 803, 498 P.2d 1276, 1281-82 (1972), the Idaho Supreme Court reversed a conviction following the admission of threats against a witness over the telephone, where the prosecution failed to prove that the caller really was the defendant. Id. In United States v. Vaulin, 132 F.3d 898, 900-01 (3d Cir.1997), the Third Circuit held that threats against the witness, which were never shown to be connected to the defendant, “may have had some highly attenuated, theoretical relevance ... [but t]he probative value is so minimal and the risk of prejudice so certain that it fails [the Rule 403 balancing test].”
¶ 105. In State v. Rogers, 96 S.C. 350, 80 S.E. 620, 620-21 (1914), a conviction was reversed after the trial judge admitted into evidence a letter threatening a witness *859 without any proof the defendant had sent it. The South Carolina Supreme Court later summarized the law on the subject as follows: “References to threats or dangers to witnesses are improper unless evidence is offered connecting the defendant with the threats.... It would be a ‘prostitution of justice’ to permit evidence that someone attempted to influence a witness by fear or fright without any evidence that connects the defendant with the tampering.” Mincey v. State, 314 S.C. 355, 444 S.E.2d 510, 511 (1994) (citations omitted). The error in Mincey—where the prosecutor alleged threats against witnesses without proving them—was so egregious that the reviewing court found defense counsel constitutionally ineffective for failing to object. Id.
¶ 106. I note also that in today’s case, one of the witnesses, Smith, was erroneously permitted to testify that he received death threats from a phone number and voice he did not recognize—though I concede that Jordan’s objection at trial (to hearsay) was inadequate to preserve the issue for appeal. Nonetheless, the prosecutor compounded the error by linking the anonymous threats with the unsubstantiated allegations regarding the video—their common use of the slang “murk,” meaning to murder. As the majority notes, the word is apparently in wide enough use that it has little if any evidentiary value as to the identity of the caller.
¶ 107. Finally, in State v. Skinner, 218 N.J. 496, 95 A.3d 236, 238-39 (2014), the New Jersey Supreme Court reversed a conviction based on the erroneous admission of song lyrics. It held:
Fictional forms of inflammatory self-expression, such as poems, musical compositions, and other like writings about bad acts, wrongful acts, or crimes, are not properly evidential unless the writing reveals a strong nexus between the specific details of the artistic composition and the circumstances of the underlying offense for which a person is charged, and the probative value of that evidence outweighs its apparent prejudicial impact.

Id.

¶ 108. The Mississippi Supreme Court seems to have taken the same position as the New Jersey Supreme Court did in Skinner. In Brooks v. State, 903 So.2d 691, 700 (¶¶ 34-35) (Miss.2005), a case cited by Jordan to the trial court, our supreme court held that rap lyrics were erroneously admitted because of the tenuous connection to the case. Contrary to the prosecutor’s claims, the lyrics “[made] no mention of gangs” and “discuss[ed] murder by use of a gun” when the actual murder was carried out with a meat fork. The prosecutor was also erroneously allowed to claim a connection between the murder weapon and the defendant’s tattoo of a devil holding a pitchfork. Id.
Conclusion
¶ 109. The video was allowed into evidence based on false or misleading testimony, and the prosecution failed to ever establish the proper predicate to introduce it under Rule 404(b). The prosecutor repeatedly claimed, without any evidence, that the video was made after the killing for which Jordan was on trial and that it was a threat against the witnesses. The video is violent and offensive, and it appears to show Jordan associating with drug dealers, using drugs himself, and endorsing violent retribution against witnesses. The prosecutor even used it to insinuate that Jordan was a gang member, that he was sending coded signals, and that he was behind an anonymous threat to one of the witnesses (which was, itself, improperly allowed into evidence). It was capped off by Jordan being unfairly cross-examined about the song’s vulgar and violent lyrics, line by line. The cumulative harm of these errors is overwhelming, and the error was preserved for appeal.
*860 ¶ 110. Jordan was tried and convicted solely on the word of two witnesses who did not implicate him until more than a year after Coleman’s death, and only after being arrested themselves. Smith’s testimony might even be viewed as exculpatory—although he claimed to have seen Jordan with a gun before and after the shot, he did not see the shot itself, and when he looked back after hearing it, Jordan was much too far away from the victim to have inflicted a contact wound, as described by the medical examiner. Even Baker (who did claim to have seen the shot) put Jordan too far away to have inflicted a contact wound, a serious inconsistency given the absence of evidence corroborating Baker’s story.
¶ 111. The prosecution’s improper bolstering of its case with the rap video denied Jordan a fair trial. I cannot join the majority in affirming his convictions, and so I dissent.
LEE, C.J., AND ISHEE, J., JOIN THIS OPINION. WILSON, J., JOINS THIS OPINION IN PART.

. The majority calls this a "close up shot of Jordan’s face,” which is an exaggeration. The scene is dimly lit, and while part of Jordan’s face is visible, it occupies only about five percent of the screen. The shot lasts about three seconds and is actually part of the opening credits—the words "WATCH IN 1080P HD FOR BEST QUALITY” actually cover Jordan’s face for the first second or so, and "A fliFILMS Production” appears and disappears in the center of the screen over the course of the shot.

. Admittedly, King seems to pick up where Henderson left off, suggesting that they are speaking from the perspective of a single individual and that the song was originally written for just one person to perform. The video does not explicitly say who wrote the song, but Henderson appears to have received top billing. The credits said "Gutta G [featuring] King Chris”—Gutta G is presumably Henderson's stage name. At one point, he seems to refer to himself as "Gutta” during the song.

. Smith said he attended elementary school with King, but he was not sure about the man’s name—he thought it was “Chris Randall.” Baker seemed to be more confident about the name (Chris King), but he said nothing more than that King was someone he could "identify.”

. Jordan certainly knew this at trial, after having seen the finished video; but the issue is what Jordan knew at the relevant time— when he participated in the filming.

. The video had been admitted into evidence at this point, but not played for the jury.

. Among other things, Coleman wrote: ‘‘New year[,] new gear [f\ fraud n* * * *s disappear \f\ no mercy[,] no emotions [/] fake smiles get yo teeth brok[e]n” and "I’m turnin’ my back / kept real with [you] n* * * *s but I guess y’all couldn’t handle it \J] talk a bunch of j[i]bberish [/]... I see hatin' and disloyalty in yo eyes and [you] ain’t finna f* * * me.”